# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>BRANDON LEE RYAN,<br><br>Appellant. | DIVISION ONE<br><br>No. 81395-1-I<br><br>UNPUBLISHED OPINION |

DWYER, J. — Brandon Ryan was charged with unlawful possession of a controlled substance with intent to deliver, with special enhancements alleged for being armed and in a school zone at the time of this offense, and with unlawful possession of a firearm in the first degree. A jury trial resulted in convictions on both counts and both enhancements. On appeal, he avers that insufficient evidence supported his conviction for possession with intent to deliver and the firearm enhancement related to that conviction. He also asserts that the trial court improperly allowed an expert witness to testify and that this witness rendered a forbidden opinion on his guilt, denying him a fair trial. We affirm.

I

At about 7:00 a.m. on June 20, 2017, Pierce County Sheriff's Deputies Jason Bray and Seth Huber, riding in a marked patrol vehicle, entered a supermarket parking lot in the South Hill neighborhood of Puyallup. Almost immediately, the deputies saw Brandon Ryan leaning into a parked vehicle through the vehicle's passenger side window. Deputy Huber testified to seeing

an item pass between Ryan's hands and the hands of the vehicle's driver. Ryan then appeared to notice the deputies and "turned around, removed his hands that were inside the vehicle and turned and walked briskly away from" the patrol vehicle. He approached another vehicle, a red Chevrolet Blazer, and entered that vehicle through the passenger's side door. The driver of the Blazer was later identified as Ryan's girlfriend, Kelsey Kittleson. Based on what they had observed, the deputies made contact with Ryan and Kittleson. Ryan was soon arrested on an outstanding warrant; Kittleson was removed from the vehicle but not arrested.

As Ryan was being removed from the Blazer, the detectives observed two safes inside. One safe was located on the vehicle's center console; the other was located behind the front passenger seat. Kittleson informed the deputies that one of the safes contained a firearm with an extended magazine and methamphetamine, and that she would take responsibility for those items to prevent Ryan from "get[ting] in trouble."[1]

Deputy Huber obtained a search warrant for the Blazer. Although he could not recall at the time of trial, Huber testified that he believed both safes were unlocked. The safe located behind the passenger seat contained a nine millimeter handgun. The safe located on the front center console, meanwhile, was found to contain just over 40 grams of methamphetamine, around 50 empty "baggies," a small digital gram scale, and a metal spoon. The deputies also

---

[1] As Deputy Huber later testified, this information was not accurate; the methamphetamine was in a separate safe from the firearm with the extended magazine.

located an extended magazine for the handgun, as well as men's clothing, and speakers and a toy car belonging to Ryan.

Ryan was charged with possession of a controlled substance with intent to deliver. This charge was augmented by a special allegation that he was armed with a firearm at the time of this offense, and by another special allegation that he was within 1,000 feet of the perimeter of a school ground at the time of the offense. He was also charged with unlawful possession of a firearm in the first degree. After a jury trial, he was found guilty on both counts and sentenced to a total of 120 months of confinement. He appeals.

II

Ryan first challenges the sufficiency of the evidence supporting his conviction for possession of a controlled substance with intent to distribute. In doing so, he points to circumstantial evidence that purports to show Kittleson, not Ryan, had exclusive possession of the methamphetamine, and that he was not involved in the formulation or execution of any plan to distribute the methamphetamine. Ryan's challenge relies on a construction of the evidence in a light more favorable to himself than that which our standard of review allows. Viewed in the proper light, the evidence against Ryan was sufficient to support this conviction.

Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the

State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201. Circumstantial evidence and direct evidence may be equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

In order to prove the offense with which Ryan was charged, the State had to prove that he (1) unlawfully possessed (2) a controlled substance with (3) the intent to deliver it. RCW 69.50.401(1). As a general rule, "[m]ere possession of a controlled substance, including quantities greater than needed for personal use, is not sufficient to support an inference of intent to deliver." State v. O'Connor, 155 Wn. App. 282, 290, 229 P.3d 880 (2010). However, a finder of fact may infer intent to deliver from possession of a significant amount of a controlled substance plus at least one additional factor. O'Connor, 155 Wn. App. at 290. Thus, Washington courts have upheld convictions for possession with intent to deliver based on the possession of a large amount of drugs and some quantum of additional evidence. See, e.g., State v. Hotchkiss, 1 Wn. App. 2d 275, 281-82, 404 P.3d 629 (2017) (8.1 grams of methamphetamine with $2,150 in cash was sufficient), review denied, 190 Wn.2d 1005 (2018); State v. Simpson, 22 Wn. App. 572, 575-76, 590 P.2d 1276 (1979) (quantity of drugs and nature of packaging sufficient); State v. Harris, 14 Wn. App. 414, 418-19, 542 P.2d 122 (1975) (quantity of drugs and a scale sufficient).

Deputy Huber testified that, at the time his police vehicle pulled into the parking lot, Ryan was leaning into a truck's open window and appeared to be passing an item to the driver. Ryan then "looked directly at [the police]" and "then hastily began to walk . . . through the parking lot" before entering a Chevrolet Blazer in which Kittleson was waiting. Upon detaining both individuals, Deputy Huber noticed a safe "on the arm rest between the front passenger's and the driver's seat" and another safe "directly behind the . . . front passenger's seat." Kittleson informed Huber, at the time of Ryan's arrest, that one of the safes contained both methamphetamine and a firearm with an extended magazine.

Upon obtaining a search warrant, the police opened the safes. The safe on the arm rest contained around 50 small plastic "baggies," 40.2 grams of methamphetamine, and a digital gram scale. The other safe contained a handgun.

At trial, the State called Pierce County Sheriff's Department Detective Jesse Hotz, an experienced narcotics officer. Detective Hotz testified that "[m]ost of the dealers, street-level dealers, will use" the exact variety of scale found in the safe for weighing quantities of narcotics. He also identified the "baggies" as the sort "used for individually weighing out the product . . . so that way it's just a real quick transaction." Finally, Detective Hotz stated that the quantity of methamphetamine in the safe was more than most methamphetamine users would consume in a few days, and that it was common practice for dealers to sell

between 1 and 1.8 grams of the drug at the time. Detective Hotz estimated that the quantity of methamphetamine in the safe was worth around $400.

In addition, Kittleson, who was waiting for Ryan in the driver's seat of the Blazer at the time police first noticed him, stated that she had been trying to "get rid of" the methamphetamine earlier in the day by selling it. She also told police at the time of the arrest "that she would take responsibility for the items within the safe" because "she did not want her boyfriend to get in trouble." These statements support the inference that Kittleson was present to assist Ryan in "get[ting] rid of" the methamphetamine by transferring it to others, actions that Kittleson understood to be illegal.

Considering the totality of the evidence, and construing the evidence and all reasonable inferences therefrom in the light most favorable to the State, a rational trier of fact could reasonably conclude that Ryan unlawfully possessed the methamphetamine and intended to deliver quantities of that drug to customers.

Ryan argues otherwise, noting that no cash was found on his person at the time of his arrest, that he was not in possession of a physical customer log, and that he was not shown to have had either a key or knowledge of a combination to open the safe. He urges that these facts, and the inferences that can be drawn from these facts, fatally undermine the case against him.

Again, however, when the sufficiency of the evidence is challenged on appeal, we construe the evidence and all reasonable inferences supported by that evidence in the light most favorable to the State, not the defendant. Salinas,

6

119 Wn.2d at 201. Thus, Ryan's challenge is unavailing. Sufficient evidence supported Ryan's conviction for possession of a controlled substance with the intent to deliver it.

III

Ryan next avers that insufficient evidence supported the firearm enhancement to his conviction. This is so, he asserts, because there was no nexus connecting the presence of the firearm in his vehicle to his possession of the methamphetamine with intent to distribute. In doing so, he asks anew that we construe the evidence in a light less than that which is most favorable to the State. We decline his invitation to do so.

Once more, the test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt. Salinas, 119 Wn.2d at 201. In a sufficiency of the evidence claim, the defendant admits the truth of the evidence and the court views the evidence, and all reasonable inferences drawn from that evidence, in the light most favorable to the State. Salinas, 119 Wn.2d at 201. Credibility determinations are made by the trier of fact and are not subject to review. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Pursuant to RCW 9.94A.533(3), a court must add additional time to a sentence if the defendant is found to have been armed with a firearm while committing the crime. State v. Houston-Sconiers, 188 Wn.2d 1, 16-17, 391 P.3d 409 (2017). "To establish that a defendant was armed for the purpose of a

firearm enhancement, the State must prove (1) that a firearm was easily accessible and readily available for offensive or defensive purposes during the commission of the crime and (2) that a nexus exists among the defendant, the weapon, and the crime." State v. Sassen Van Elsloo, 191 Wn.2d 798, 826, 425 P.3d 807 (2018).

"In every case, whether a defendant is armed is a fact specific decision." State v. Neff, 163 Wn.2d 453, 462, 181 P.3d 819 (2008). "The defendant does not have to be armed at the moment of arrest to be armed for purposes of the firearms enhancement." State v. O'Neal, 159 Wn.2d 500, 504, 150 P.3d 1121 (2007). "[T]he State need not establish with mathematical precision the specific time and place that a weapon was readily available and easily accessible, so long as it was at the time of the crime." O'Neal, 159 Wn.2d at 504-05. The facts available to the jury here established the existence of a nexus between Ryan, the offense with which he was charged, and the presence of a firearm.

The underlying crime with which Ryan was charged was possession of a controlled substance with intent to deliver. As the prosecutor noted in his closing argument:

> He does not have to be in possession of the gun, or even the drugs, when the hand-to-hand transaction occurs. When he was in the car, that's where our crime happens. That's where the possession happens of both the drugs and the firearm.

Viewing the evidence in the light most favorable to the State, Ryan had already committed the crime of possession with intent to deliver before he left the vehicle. That he was subsequently seen handing off an item to another individual in the parking lot serves only as proof of his intent to deliver. At the

moment the crime was complete—when Ryan was in the vehicle with the methamphetamine and decided that he would leave his vehicle to further a sale—the firearm was in an unlocked container on a seat directly behind the seat in which Ryan was sitting. Between Ryan and the container was a distance of less than 36 inches. Deputy Huber testified that this would have been readily accessible to Ryan:

> [HUBER:] . . . An additional safe was found directly behind the front passenger's seat.
> [COUNSEL:] Again, the same spot where the defendant was sitting?
> [HUBER:] Directly behind where the defendant was sitting.
> [COUNSEL:] Okay, were those items, if you recall, within—would have been within arm's reach of the defendant?
> [HUBER:] Absolutely.
> [COUNSEL:] Can you estimate how many feet behind or inches, was the second safe in the back seat?
> [HUBER:] I would say 36 inches or less.

Ryan, in arguing against the sufficiency of the evidence, avers that the weapon was not accessible, because the safe was locked and he had no way of opening it. He points to the lack of any keys on his person at the time of his arrest and the appearance of pry marks on the safe to support the proposition that it had to be forced open by the police. To accept this contention, however, would require us to view the evidence in the light most favorable to him and not to the State.

Indeed, the State presented evidence contradicting Ryan's assertion. As Deputy Huber testified, any damage to the safe "could easily have been there prior to" Ryan's arrest, and that he had "broken into several and usually the

9

damage is more extensive" than what was seen on the safe at issue. As he went on to state:

> [COUNSEL:] This is, to the best of your knowledge as you stated earlier, this was an unlocked safe?
> [HUBER:] What I stated earlier, and still to this point, had I needed to breach this or had anybody who was helping us to breach this, I do believe in my opinion that there would be substantially more damage to the safe.
> [COUNSEL:] In conjunction with the locking mechanism missing, would it be your conclusion that this was most likely locked or unlocked?
> [HUBER:] Unlocked.

A rational jury could reasonably conclude that Ryan did not go to conduct a drug sale with a firearm in the vehicle but locked in a safe that he could not access. That jury could instead conclude that the firearm was in an unlocked safe, 36 inches away from Ryan, when he decided to leave his vehicle to approach the people sitting in the other vehicle. We defer to the jury's judgment regarding the conflicting testimony. Walton, 64 Wn. App. at 415-16.

The evidence adduced by the State supported the inference that at the time of the crime's completion, a firearm was sitting in an unlocked container within Ryan's arm's reach. Thus, a rational trier of fact could reasonably find that a nexus existed between Ryan, the firearm, and his possession of a controlled substance with intent to distribute. Sufficient evidence supported the imposition of a firearm enhancement to Ryan's conviction.

                                    IV

Ryan next assigns error to the trial court's decision to allow Detective Hotz to testify pursuant to ER 702. Initially, the trial court granted Ryan's motion to exclude Detective Hotz's testimony. The court later reversed itself, stating:

On further reflection and looking at the rules, I think that I will allow Detective Hotz to testify. I would like it to be narrowed, if possible, in terms of sort of what his experience is and sort of what's typical.

On appeal, Ryan avers that this decision allowed the State to introduce inadmissible criminal profile testimony that amounted to an opinion on Ryan's guilt. Ryan urges that Detective Hotz's testimony was unnecessary because this case did not involve any "arcane aspects of drug dealing . . . outside the common knowledge of jurors."

ER 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Whether expert testimony may be allowed pursuant to ER 702 depends on two factors: (1) whether the testifying witness qualifies as an expert and (2) whether the witness's testimony would be helpful to the trier of fact. State v. Janes, 121 Wn.2d 220, 235-36, 850 P.2d 495 (1993). "Practical experience is sufficient to qualify a witness as an expert." State v. Ortiz, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992). We review a trial court's decision to admit expert opinion testimony pursuant to ER 702 for an abuse of discretion. State v. Green, 182 Wn. App. 133, 146, 328 P.3d 988 (2014).

Detective Hotz testified to involvement in hundreds of narcotics cases throughout his career and to having carried out over 40 controlled buys as an undercover agent. Detective Hotz also testified to having attended and completed specialized narcotics officer training. This experience and training

was sufficient to qualify Detective Hotz as an expert regarding "the arcane world of drug dealing and certain drug transactions." State v. Avendano-Lopez, 79 Wn. App. 706, 711, 904 P.2d 324 (1995). Further, testimony regarding the typical characteristics of drug dealing transactions can be helpful to the trier of fact. Avendano-Lopez, 79 Wn. App. at 711. It is unlikely that a trier of fact unfamiliar with methamphetamine transactions would know how much of the drug a person would carry for personal consumption (as opposed to the amount carried for business purposes), or that methamphetamine dealers use safes or lock boxes to hold their inventory, or the methods by which such dealers make hand-to-hand transactions. In any event, the trial court did not abuse its discretion by considering the proffered evidence to be potentially beneficial to the jury. Green, 182 Wn. App. at 146.

V

Finally, Ryan avers that Detective Hotz was improperly allowed to render an opinion as to his guilt when Detective Hotz testified that the assortment of items in his safe signaled an "intent to distribute." Because he did not object to this statement at trial, Ryan's claim of error is reviewable only if he can show that not striking this testimony was a manifest error affecting a constitutional right. State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007) (citing RAP 2.5(a)(3)). Ryan fails to show that an error of such magnitude was manifest.

"Opinions on guilt are improper whether made directly or by inference." State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). Such testimony may violate the defendant's constitutional right to a jury trial, which vests in the jury

"'the ultimate power to weigh the evidence and determine the facts.'" State v. Montgomery, 163 Wn.2d 577, 590, 183 P.3d 267 (2008) (quoting James v. Robeck, 79 Wn.2d 864, 869, 490 P.2d 878 (1971)). A law enforcement officer's improper opinion testimony may be particularly prejudicial because it carries "'a special aura of reliability.'" State v. King, 167 Wn.2d 324, 331, 219 P.3d 642 (2009) (quoting Kirkman, 159 Wn.2d at 928). An opinion is also more likely to be improper if it is "stated in conclusory terms parroting the legal standard." Montgomery, 163 Wn.2d at 594.

In determining whether testimony constitutes an improper opinion on guilt, we necessarily consider the specific circumstances of each case, including (1) "'the type of witness involved,'" (2) "'the specific nature of the testimony,'" (3) "'the nature of the charges,'" (4) "'the type of defense,'" and (5) "'the other evidence before the trier of fact.'" State v. Demery, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (quoting City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993)). However, the admission of an improper opinion, without objection from defense counsel, is not automatically reviewable as a "manifest" constitutional error. Kirkman, 159 Wn.2d at 936; see RAP 2.5(a)(3). This exception "'is a narrow one.'" Kirkman, 159 Wn.2d at 934 (quoting State v. Scott, 110 Wn.2d 682, 687, 757 P.2d 492 (1988)). "[W]e have found constitutional error to be manifest only when the error caused actual prejudice or practical and identifiable consequences." Montgomery, 163 Wn.2d at 595 (citing Kirkman, 159 Wn.2d at 934-35).

Ryan asserts that Detective Hotz expressed a personal belief that Ryan had committed the charged crime. Specifically, Ryan argues that the following statement was an improper opinion on guilt:

> [E]verything that is sitting right there is common trade craft of a narcotics dealer. A lock box, backpack, a bag. You're going to have the product, the baggies, the scale, possibly a firearm, either on the individual or within close proximity. Narcotics, the baggies, the scale, that's intent to distribute.

Defense counsel interposed no objection.[2] Ryan avers that allowing this opinion testimony was manifest error affecting a constitutional right and, thus, that he may challenge it for the first time on appeal. RAP 2.5(a)(3).

In this respect, Montgomery is instructive. In Montgomery, a prosecution for possession of pseudoephedrine with intent to manufacture methamphetamine, two detectives observed the defendants purchasing pseudoephedrine and other items. At trial, one of the detectives testified:

> "I felt very strongly that they were, in fact, buying ingredients to manufacture methamphetamine based on what they had purchased, the manner in which they had done it, going from different stores, going to different checkout lanes. I'd seen those actions several times before."

Montgomery, 163 Wn.2d at 587-88.

The second detective opined, "'those items were purchased for manufacturing.'" Montgomery, 163 Wn.2d at 588. Further, after reviewing the necessary ingredients for making methamphetamine and the defendant's

---

[2] On appeal, Ryan asserts that an objection was not necessary, because his motion in limine to preclude Detective Hotz from testifying served as a standing objection. Not so. Ryan's attempt to prevent Detective Hotz from testifying to *anything* is not a substitute for an objection to Detective Hotz testifying to *this thing.* ER 103(a)(1) requires a specific objection to preserve a claim of error.

purchases, a forensic chemist added, "'these are all what lead me toward this pseudoephedrine is possessed with intent.'" Montgomery, 163 Wn.2d at 588.

Our Supreme Court held that this testimony constituted improper opinions on the defendant's guilt, noting that the testimony involved "the core issue and the only disputed element, Montgomery's intent." Montgomery, 163 Wn.2d at 594. The court concluded, however, that no constitutional error was manifest from the testimony, because the jurors were properly instructed that they were the "'sole judges of the credibility'" and were not bound by expert witness opinions. Montgomery, 163 Wn.2d at 595.

Here, in a situation analogous to Montgomery, Detective Hotz stated that the items found in the defendant's possession at the time of his arrest showed an intent to distribute methamphetamine. And, as in Montgomery, whether Ryan intended to distribute methamphetamine was "the core issue" on which his prosecution depended. However, like the trial court in Montgomery, the trial court herein properly instructed the jury on witness credibility:

> You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. In considering a witness's testimony, you may consider these things: the opportunity of the witness to observe or know the things he or she testifies about; the ability of the witness to observe accurately; the quality of a witness's memory while testifying; the manner of the witness while testifying; any personal interest that the witness might have in the outcome or the issues; any bias or prejudice that the witness may have shown; the reasonableness of the witness's statements in the context of all of the other evidence; and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony.

Absent any evidence to the contrary, such as a written jury inquiry, we presume that the jury followed the court's instructions.  Montgomery, 163 Wn.2d at 596 (citing Kirkman, 159 Wn.2d at 928).

In addition, as defense counsel immediately elicited on cross-examination, Detective Hotz did not personally witness any of the conduct with which Ryan was charged, nor did he assert or imply a belief as to the true owner of the safes or their contents.  As Ryan argued in his summation, this testimony could also support the inference that Kittleson, and not Ryan, was the individual harboring an intent to distribute.  Given that the jury was properly instructed as to its role in judging witness credibility, and that Hotz's testimony did not identify a particular person who carried the intent to distribute, the record does not establish actual prejudice.  This is especially so, given the other, abundant evidence of guilt (including Kittleson's admissions and the deputies' observations of Ryan appearing to engage in the transaction before their very eyes).[3]  Thus, no error is manifest.  Montgomery, 163 Wn.2d at 595.

---

[3] Were we to conclude that the error was manifest, we would nevertheless deem it to be harmless.  See State v. Scott, 110 Wn.2d at 687 n.4 (manifest constitutional error does not warrant appellate relief when it is harmless pursuant to the constitutional harmless error test).

Affirmed.

_____ Dwyer, J.

WE CONCUR:

_____   _____
Andrus, A.C.J.            Mann, C.J.